United States District Court
Southern District of Texas

**ENTERED**

October 04, 2023

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BENJAMIN BENFER, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-2196 |
| | § | |
| CITY OF BAYTOWN, TEXAS, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |
| | § | |

## ORDER

Pending before the Court is Defendants City of Baytown, Texas ("the City") and Officer Barry Calvert's ("Officer Calvert") (collectively "Defendants") Motion to Dismiss (Doc. No. 14). Plaintiff Benjamin Benfer ("Plaintiff") responded in opposition (Doc. No. 25) and Defendants replied (Doc. No. 26). Having considered the briefs and arguments of counsel, the Court hereby **GRANTS** Defendants' Motion to Dismiss.

### I.    Factual Background

This is a federal civil rights case stemming from a traffic stop during which Plaintiff was bitten by a K-9. (Doc. No. 9 at 3-4).

The sequence of events is heavily disputed by the parties. Fortunately, most of the pertinent events have been captured on video. The Court will begin by summarizing the facts and allegations as pleaded in Plaintiff's Amended Complaint. Plaintiff's complaint attached a report from alleged

police dog expert Vanness H. Bogardus ("Bogardus Report") (Doc. No. 9-1).[1] The Court will then summarize how events unfolded based on the Court's independent review of Officer Calvert's dashboard camera and body camera footage.[2]

### A. Facts as Pleaded in Plaintiff's Amended Complaint & Bogardus Report

On the evening of Valentine's Day 2021, Officer Calvert, accompanied by his K-9, was allegedly called to address a domestic disturbance unrelated to this case. (Doc. No. 9-1 at 7). Before the disturbance call, police dispatchers put out a "Be On The Lookout" ("BOLO") report for a 2020 silver Toyota RAV4. There was no license plate information provided. (*Id.*). While enroute to address the domestic disturbance, Officer Calvert allegedly observed Plaintiff, who was driving a 2020 silver Mitsubishi SUV, run a red light. (*Id.*). Plaintiff was accompanied by his wife. In addition to believing that he saw Plaintiff run a red light, Officer Calvert noted that he believed Plaintiff's vehicle could possibly be the stolen vehicle mentioned in the BOLO report. (*Id.*).

According to Plaintiff's Amended Complaint, Officer Calvert then stopped Plaintiff for running a red light. (Doc. No. 9 at 4). Plaintiff pleads that he did not run a red light. (*Id.*). Plaintiff further pleads that a criminal court judge later granted "a motion to suppress due to there being no proof of any traffic violation on Calvert's dashcam." (*Id.*). Plaintiff pleads that, after he was stopped, Officer Calvert unleashed his K-9, Hero, to bite Plaintiff. Plaintiff pleads that he suffered several bites that required stitches, one of which he claims was in close proximity to his brachial artery. (*Id.*). Following the incident, Plaintiff pleads that Officer Calvert "falsely charged" his wife

---

[1] The Court notes that pursuant to Federal Rule of Civil Procedure 10(c), it is permitted to consider the Bogardus Report (Doc. No. 9-1) as being part of Plaintiff's Amended Complaint. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."). In doing so, the Court is restricted to considering the "nonconclusory, factual portions" of the report. *Blanchard-Daigle v. Geers*, 802 Fed.Appx. 113, 115-16 (5th Cir. 2020) (citing *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006) that "[e]ven if the non-opinion portions of an expert's affidavit constitute an instrument pursuant to Rule 10, opinions cannot substitute for facts…").

[2] The parties raise evidentiary objections pertaining to Officer Calvert's report of the incident and his body camera footage that will be further addressed in subsequent parts of this Order.

with interference with public duties and "[a]fter much money and time were expended [sic] all charges were dropped against [Plaintiff and his wife] without any obligation required."[3] (*Id.*).

### B. Facts as Viewed from Officer Calvert's Body Camera & Dashboard Camera Footage[4]

In considering a motion to dismiss, matters attached to or incorporated into a complaint by reference and that are central to a party's claims may also be considered. *Funk v. Stryker Corp.*, 630 F.3d 777, 783 (5th Cir. 2011); *New Orleans City v. Ambac Assur. Corp.*, 815 F.3d 196, 200 (5th Cir. 2016). Here, Plaintiff refers to Officer Calvert's body camera and dashboard camera in his Amended Complaint, and the contents of the footage are central to his claims. Therefore, it is appropriate to consider the footage in reviewing Plaintiff's claims. *B.S. b/n/f Justin S. v. Waxahhachie Ind. Sch. Dist.*, 2023 WL 2609320, at n. 64 (5th Cir. Mar. 23, 2023); *see Phillips next friend of J.H. v. Prator*, 2021 WL 3376524, at *1 n.1 (5th Cir. Aug. 3, 2021) (considering video footage that depicted an encounter between a student and the deputy because plaintiff referenced the video in her complaint and it was central to her claim).

Based on the video footage, Officer Calvert followed Plaintiff, used his emergency lights, and turned on his siren. Plaintiff pulled into the parking lot of an apartment complex and stopped. (Officer Calvert Body Camera Footage, Doc. No. 14-2 at 0:00-0:22).

Almost immediately after Officer Calvert exited his patrol car, Plaintiff and his wife also exited their vehicle despite being told to stay in their car. (*Id.* at 0:22-0:24). Plaintiff then began walking away from Officer Calvert. (*Id.* at 0:24-0:30). Officer Calvert repeatedly commanded for him to stop. At one point, Officer Calvert attempted to physically stop Plaintiff by grabbing his

---

[3] Plaintiff's wife is not a party in this lawsuit.

[4] The Court notes that Officer Calvert's dashboard camera footage of the actual incident in question is very brief. Although the video is 20 minutes long in total, the only pertinent parts are in the first minute, where Officer Calvert follows Plaintiff and his wife into the parking lot and then gets out of the vehicle. From there, the dashcam video remains pointed away from where the actual dispute took place and Officer Calvert's body camera footage better informs the facts. (*See* Doc. No. 14-1).

arm. (*Id.* at 0:28-0:34). In response, Plaintiff continued to be non-compliant and pulled away. Plaintiff said "no" to Officer Calvert repeatedly, demanded that he not touch him, and told Officer Calvert that they were "in a private community" while actively walking away. (*Id.*).

Officer Calvert then warned Plaintiff that he had "a dog" that "would bite [Plaintiff]" if Plaintiff continued to refuse to comply. (*Id.* at 0:36-37). Officer Calvert grabbed Plaintiff's wrist in an attempt to restrain him, but Plaintiff pulled out of his grasp. (*Id.* at 0:37-0:39). A scuffle then ensued, and Officer Calvert appeared to push Plaintiff into nearby bushes. (*Id.* at 0:47). As that scuffle ensued, Officer Calvert contends, and Plaintiff does not deny, that Plaintiff's wife entered the fray and grabbed at his duty belt near his weapon. (*Id.*). Whether her actions were intended to get ahold of Officer Calvert's weapon is not clear, but the video confirms her attempt to interfere with Officer Calvert's efforts. At that point, Officer Calvert then yelled "assist," which presumably deployed his K-9 while Officer Calvert dealt with Plaintiff's wife. (*Id.* at 0:51). Officer Calvert told Plaintiff's wife to put her hands behind her back and attempted to handcuff her while simultaneously commanding Plaintiff to get on the ground (*Id.* at 1:01-1:16). Officer Calvert's K-9 then began biting Plaintiff. (*Id.* at 1:10-1:17). After successfully handcuffing Plaintiff's wife, Officer Calvert ordered her to sit on the ground (*Id.* at 1:38-1:41).

Officer Calvert then walked to his patrol vehicle, grabbed a second pair of handcuffs, and returned to where Plaintiff and his K-9 were on the ground. (*Id.* at 1:41-1:51). The K-9 appears to continue to bite Plaintiff as Officer Calvert commanded Plaintiff to put his hands behind his back and handcuffed his left wrist. (*Id.* at 1:57-2:05). Officer Calvert struggled to handcuff him because Plaintiff still failed to fully put his hands behind his back as requested. (*Id.* at 2:05-2:12). It is unclear from the video at this point if Plaintiff's difficulty putting his hands behind his back was purposeful or because the K-9 was biting him. Nevertheless, Officer Calvert repeatedly told

4

Plaintiff to "put his hands behind his back" and to "stop fighting me" as he attempted to handcuff him. (*Id.* at 2:15-2:20). Finally, Officer Calvert successfully handcuffed Plaintiff. (*Id.* at 2:31). Officer Calvert then restrained the K-9 and stepped away from Plaintiff and his wife, who were, at that point, both handcuffed on the ground. (*Id.* at 2:34-2:38).

### C. Plaintiff's Causes of Action & This Dispute

Plaintiff brings several causes of action against Defendants. According to his Amended Complaint, Plaintiff's causes of action are as follows:

1. A cause of action under 42 U.S.C. § 1983 for unlawful detention and arrest without probable cause against Officer Calvert because he allegedly violated the Fourth and Fourteenth Amendments of the United States Constitution by stopping Plaintiff without probable cause or reasonable suspicion (*Id.* at 7);

2. A cause of action under 42 U.S.C. § 1983 for excessive force against Officer Calvert because he allegedly violated the Fourth and Fourteenth Amendments of the United States Constitution when Plaintiff was attacked and bitten by the K-9 controlled by Officer Calvert (*Id.* at 7-8);

3. A cause of action under 42 U.S.C. § 1983 against Officer Calvert for malicious prosecution because he allegedly "made material misrepresentations in the police report in order to justify the arrest and prosecution when he knew there was no probable cause to either arrest or prosecute Plaintiff." (*Id.* at 9);

4. A cause of action against Officer Calvert for common law assault under Texas law (*Id.* at 8); and,

5. A cause of action for municipal liability against the City of Baytown under 42 U.S.C. § 1983 for failing to have adequate written policies, failing to train and supervise

5

Officer Calvert on how to handle a K-9, and because the City has allegedly adopted a

pattern, practice, and custom of using K-9s to inflict injuries upon non-threatening

suspects (*Id.* at 8).

Defendants moved to dismiss Plaintiff's claims in their entirety. In their Motion to Dismiss,

Defendants argue Plaintiff has (1) failed to allege facts to state a plausible claim under the

Fourteenth and Fourth Amendments;[5] (2) failed to allege sufficient facts to support his unlawful

detention, arrest without probable cause, excessive force, malicious prosecution, and state law

assault claims and to overcome Officer Calvert's qualified immunity; and (3) failed to show that

the City of Baytown violated Plaintiff's rights. Plaintiff responded in opposition (Doc. No. 25) and

Defendants replied (Doc. No. 26).

## II.    Legal Standard

A defendant may file a motion to dismiss a complaint for "failure to state a claim upon

which relief may be granted." Fed. R. Civ. P. 12(b)(6). To defeat a motion to dismiss under Rule

12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."

---

[5] Defendants maintain that because Plaintiff's Fourteenth Amendment claims are "based on the propriety of his arrests, or force used therein," they are not cognizable under the Fourteenth Amendment and should be dismissed. (Doc. No. 14 at 13). This Court agrees with Defendants. In *Gone v. Smith*, the plaintiff brought both Fourth and Fourteenth Amendment claims against the City of Pasadena. 2017 WL 978703 (S.D. Tex. Mar. 14, 2017). The court held that the plaintiff's Fourteenth Amendment claim should be dismissed since the plaintiff failed to plead any specific unconstitutional conduct in violation of the Fourteenth Amendment. *Id.* at *3. After dismissing the plaintiff's Fourteenth Amendment claims, the court consolidated and considered the plaintiff's claims of excessive force under the Fourth Amendment. *Id.* This Court finds that case instructive. Plaintiff here has not pleaded unconstitutional conduct specific to the Fourteenth Amendment. In Plaintiff's Amended Complaint, he only cites the Fourteenth Amendment without specific allegations. Plaintiff's claims of unlawful detention, arrest without probable cause, excessive force, and malicious prosecution are all covered by the Fourth Amendment. Thus, the Court will consolidate and consider all of Plaintiff's § 1983 claims as alleged violations of the Fourth Amendment. *See also Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process" must be the guide for analyzing these claims'"); *Cuadra v. Houston Indep. Sch. Dist.*, 626 F. 3d 808, 814 (5th Cir. 2010) (dismissing plaintiff's Fourteenth Amendment claims because alleged pretrial deprivations of constitutional rights should be addressed under the Fourth Amendment). The Court hereby dismisses claims made pursuant to the Fourteenth Amendment but will consider them under the rubric of the Fourth Amendment.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept factual assumptions or legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

To determine whether to grant a Rule 12(b)(6) motion, a court may look only to allegations in a complaint to determine their sufficiency. *Santerre v. Agip Petroleum Co., Inc.*, 45 F.Supp.2d 558, 568 (S.D. Tex. 1999); *Atwater Partners of Texas LLC v. AT & T, Inc.*, 2011 WL 1004880 (E.D. Tex. 2011). A court may, however, consider matters outside the four corners of a complaint if they are incorporated by reference, items subject to judicial notice, matters of public record, orders, items appearing in the record of a case, and exhibits attached to a complaint whose authenticity is unquestioned. *See Chawla v. Shell Oil Co.*, 75 F.Supp.2d 626, 633 (S.D. Tex. 1999); *Brock v. Baskin-Robbins USA Co.*, 113 F.Supp.2d 1078, 1092 (E.D. Tex. 2000) (at motion to

dismiss for failure to state a claim, a court may consider an indisputably authentic document that is attached as an exhibit, if plaintiff's claims are based on the document).

Moreover, when defendants attach video evidence to a motion to dismiss for failure to state a claim that is referred to in the complaint and central to it, a court may consider that evidence. *Inclusive Cmty. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019); *Hartman v. Walker*, 685 Fed. App'x 366, 368 (5th Cir. 2017) ("[O]n a motion to dismiss, the court is entitled to consider any exhibits attached to the complaint, including video evidence …[and] the court is not required to favor plaintiff's allegations over the video evidence."). A district court "should not discount the non-moving party's story unless video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 730 (5th Cir. 2018); *see also Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013) (citing *Scott v. Harris*, 550 U.S. 372 (2007)).  That is the case here.

## III.    Analysis

### A. Evidentiary Objections

As a threshold matter, this Court must first address whether it may consider Officer Calvert's dashboard camera footage, body camera footage, and Incident Report. Officer Calvert's video footage and Incident Report are attached to Defendants' Motion to Dismiss. (Doc. Nos. 14-1, 14-2, 14-3). Plaintiff did not attach anything to his Amended Complaint (Doc. No. 9) except for the Bogardus Report (Doc. No. 9-1). That report, however, also references the videotape. Moreover, Plaintiff referred to the footage in his Amended Complaint, and the contents are central to his claims.

Defendants attached the video footage to their Motion to Dismiss (Docs. Nos. 14-1, 14-2). In response, Plaintiff did not object to this Court's consideration of the videos footage. (Doc. No. 25 at 5).

Since the parties agreed, and as noted above, the law supports that agreement, the Court will consider Officer Calvert's dashboard camera and body camera footage and will accept the scenario presented in the footage as true for purposes of this motion to dismiss. The Court will consider the recordings in analyzing the pleadings and Defendants' Motion to Dismiss, but will discount the Amended Complaint in favor of the video evidence only when that evidence "blatantly contradict[s] the plaintiffs' well-pleaded factual allegations." *Ramirez*, 716 F.3d at 375; *Griffin v. City of Sugar Land, Tex.*, 2019 WL 175098, at *6 (S.D. Tex. Jan. 11, 2019), *aff'd*, 787 Fed. App'x 244 (5th Cir. 2019) (adopting the video evidence over the complaint allegations when the video showed the plaintiff violating a city ordinance, clearly contradicting his complaint allegation that the arresting officers lacked probable cause to arrest him).

Next, the Court must address whether it may consider Officer Calvert's Incident Report. Defendants attached the 20-page Incident Report to their Motion to Dismiss (Doc. No. 14-3). They argue that Plaintiff's exhibit, the Bogardus Report, references the Incident Report and is based upon underlying information contained in the Incident Report; therefore, the Incident Report should be considered. (Doc. No. 14 at 10). Plaintiff objects and argues that Defendants only vaguely reference the Bogardus Report and do not provide a pincite to where it supposedly relies on the Incident Report. (Doc. No. 25 at 6). Given that Defendants only generally referred to the Bogardus Report as relying upon the Incident Report and failed to identify specific portions of the Bogardus Report that implicate Officer Calvert's 20-page Incident Report, the Court denies Defendants' request to consider it.

9

## B.  Qualified Immunity

The Court will now address Plaintiff's various causes of action against Officer Calvert under § 1983 alleging (1) unlawful detention, (2) arrest without probable cause, (3) excessive force, and (4) malicious prosecution. Defendants urge the Court to grant their motion because Plaintiff's claims are insufficient to overcome Officer Calvert's qualified immunity.[6] Alternatively, Defendants contend dismissal is proper because Plaintiff has failed to plead facts that would support these a claim for relief.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The purpose of qualified immunity is to protect officials from harassment, distraction, and liability when they perform their duties reasonably, but to hold public officials accountable when they exercise their powers irresponsibly. *Id.* When an official should have known that his conduct would violate the plaintiff's constitutional rights, he or she is not entitled to qualified immunity. *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

When evaluating a defendant's qualified immunity defense at the motion to dismiss stage, a district court must first find "that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *See Est. of Bonilla v. Orange Cnty.*, 982 F.3d 298, 306 (5th Cir. 2020) (quoting *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016)) ("Once a defendant asserts the qualified immunity defense, '[t]he plaintiff bears the burden of negating

---

[6] In their Motion to Dismiss, Defendants assert Officer Calvert's qualified immunity without specifying which of Plaintiff's claims they are responding to. (Doc. No. 14, at 10). Defendants' qualified immunity arguments revolve only around the alleged constitutional violations. Additionally, Defendants only raise the issue of qualified immunity *after* discussing Plaintiff's state law assault claim and why that claim should be dismissed under the Texas Tort Claims Act. (*Id.* at 9). Given the nature of this briefing, the Court will address only qualified immunity as it relates to Plaintiff's alleged constitutional violations. The Court will consider Plaintiff's state law assault claim separately.

qualified immunity.'"). A plaintiff seeking to overcome qualified immunity at the pleading stage must allege: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 732 (2011). The Supreme Court does not require district courts to address both prongs for every case. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Rather, courts may find qualified immunity based solely on plaintiff's failure to clear the clearly established hurdle. *See also* "[w]e have discretion to leapfrog the merits and go straight to whether the alleged violation offended clearly established law." This is because addressing the first prong of whether a constitutional violation took place, "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Id.* In accordance with that decision, this Court will examine Plaintiff's pleadings as they pertain to the clearly established requirement as an initial matter.

When addressing the clearly established requirement in a recent case, the Fifth Circuit noted that overcoming qualified immunity generally "requires the plaintiff to identify a case— usually, a body of relevant case law—in which an officer acting under similar circumstances was held to have violated the Constitution." *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (cleaned up). The unlawfulness of the challenged conduct must be "beyond debate." *Id.* (citing *Ashcroft*, 563 U.S. at 741). In fact, the Circuit stated, "we cannot deny qualified immunity without identifying a case in which an officer acting under similar circumstances was held to have violated the Fourth Amendment, and without explaining why the case clearly proscribed the conduct of that individual officer." (*Id.* at 345).

Here, Plaintiff has failed to meet this burden and, consequently, Officer Calvert is entitled to qualified immunity defense based on the clearly established prong. Plaintiff's response is devoid

of supporting precedent. Stated differently, it does not contain analogous case law with similar facts demonstrating that the alleged misconduct here has been found to be unlawful.[7] Since Plaintiff has failed to refute Officer Calvert's qualified immunity using precedent, this Court finds that Plaintiff has not overcome the second prong of qualified immunity—that the right he asserts was "clearly established" at the time of the alleged misconduct.

The Court could end its inquiry here and grant Officer Calvert qualified immunity based solely on Plaintiff's failure to overcome the second prong. For the sake of being thorough, however, the Court will address the first prong—whether Officer Calvert violated Plaintiff's Fourth Amendment rights. The Court finds that Plaintiff has not adequately pled facts supporting this prong either. Plaintiff failed to sufficiently plead facts supporting his § 1983 claims for (1) unlawful detention, (2) arrest without probable cause, (3) excessive force, (4) malicious prosecution.[8] The Court will now address in more detail why Plaintiff's facts, as pled, do not support a constitutional violation for any of these four claims.

1. Unlawful Detention

Defendants first challenge Plaintiff's ability to state a claim for unlawful detention. Defendants maintain that Officer Calvert had reasonable suspicion to stop Plaintiff because he

---

[7] The Court feels the need to clarify its holding on this point. The "clearly-established" prong of qualified immunity has undergone substantial interpretive changes during the past years, particularly in the Fifth Circuit. Older case law requires that the plaintiff's alleged *right* be clearly established. *Anderson v. Creighton*, 483 U.S. 635 (1987). In the present case, that *right*, among others, would be the right to not be unjustifiably assaulted by a police dog. More recent case law, however, shifts the emphasis to require that the alleged *conduct* be a clearly established violation. For example, in *Joseph*, the Fifth Circuit explained that to overcome the clearly established prong, "plaintiffs must also demonstrate that the law was "clearly established"—that, as of [the date of the incident], any reasonable officer would have known that [the officer's] behavior was unlawful." *Joseph*, 981 F.3d at 336. This Court will not comment on whether this shift is an actual change in requirements or merely a different manner of interpreting the long-existing requirements. It only observes that, under recent case law, the plaintiff's ability to present precedent is the linchpin of the analysis. All of this to say, this Court's ruling is *not* that the right alleged (to be free from assault by a police dog) is not a clearly established right. Regardless of whether it is the *right* or the *violation* that must be clearly established, this Court would still find Officer Calvert entitled to qualified immunity.

[8] Since Plaintiff failed to plead facts supporting these four constitutional violations, the Court would alternatively dismiss these claims under a traditional 12(b)(6) analysis.

thought Plaintiff ran a red light, believed that Plaintiff might be driving a stolen vehicle, and ultimately observed (and experienced) Plaintiff resisting arrest. (Doc. No. 14 at 13-14).

The Fourth Amendment protects individuals from unreasonable searches and seizures. Traffic stops are considered seizures within the meaning of the Fourth Amendment. *See U.S. v. Banuelos–Romero*, 597 F.3d 763, 766 (5th Cir.2010). The legality of seizures/traffic stops for Fourth Amendment purposes is analyzed under the standard articulated by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). To analyze the legality of a vehicle stop under *Terry*, the Court must follow the two-step process. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). The first step considers whether the officer was justified in stopping the vehicle at its inception. *Id.* The second step examines whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Id.*

This first step, determining whether the vehicle stop was justified at its inception, is satisfied "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 229 (1985). The investigatory stop must be "supported by reasonable suspicion 'that the person apprehended is committing or has committed a federal offense.'" *United States v. Thomas*, 997 F.3d 603, 609 (5th Cir. 2021) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)). "[A]n alert or BOLO report may provide the reasonable suspicion necessary to justify an investigatory stop." *Davila v. United States*, 713 F.3d 248, 258 (5th Cir. 2013) (citing *United States v. Rodriguez*, 564 F.3d 735, 742 (5th Cir. 2009)). Thus, Courts must examine "whether the officer's action was justified at its inception"—specifically, whether reasonable suspicion was then present. *See Terry*, 392 U.S. at 20.

13

Applying these standards here, the Court finds Officer Calvert's conduct was justified at the inception because he believed Plaintiff ran a red light and may have been driving a stolen vehicle.

It is undisputed that Officer Calvert initially "stopped" Plaintiff because he thought that Plaintiff ran a red light.[9] (Doc. Nos. 9 at 4; 14 at 13). Plaintiff concedes that there was a BOLO report for a stolen silver 2020 Toyota RAV4 without license plate information. (Doc. No. 9-1 at 7-8). While Plaintiff was driving a silver 2020 Mitsubishi crossover and not a silver 2020 Toyota RAV4, Plaintiff's vehicle was similar to the stolen vehicle.[10] Moreover, given the fact that the stop occurred at night, the differences between the vehicles (both Japanese cross-overs) may not have been readily apparent. Given that Officer Calvert had reasonable suspicion based upon the BOLO report that Plaintiff was committing an offense by potentially driving a stolen vehicle, the Court finds that he had reasonable suspicion to justify an investigatory stop. *See United States v. Campbell*, 178 F.3d 345 (5th Cir. 1999) (holding that officers had reasonable suspicion to conduct a *Terry* stop where the individual "matched the physical description of the bank robber from the day before and was approaching a car that matched a detailed description of the getaway vehicle").

For a *Terry* stop to be lawful, not only must an officer be justified in stopping the vehicle at its inception, but also the officer's subsequent actions must have been reasonably related in scope

---

[9] Plaintiff notes that although Officer Calvert swore in an affidavit and police report that Plaintiff ran the light before arriving at his residence, Officer Calvert's dashboard camera footage refuted this assumption after the fact and a "criminal court judge" granted "a motion to suppress due to there being no proof of any traffic violation on Calvert's dashcam." (Doc. No. 9 at 4). That a criminal court made this finding is irrelevant. First of all, the fact that the dashcam did not show Plaintiff ran the red light does not preclude the possibility that it happened. "Not showing" something does not equate to demonstrating that "it didn't happen." More importantly, for purposes of determining whether Officer Calvert had reasonable suspicion to conduct the stop, it only matters that Officer Calvert believed, at the time the stop was occurring and when he decided to conduct the stop, that Plaintiff ran a red light. This belief constitutes reasonable suspicion.

[10] Although Plaintiff's vehicle was not exactly the same as the one described in the BOLO report, the Court nonetheless finds that the initial stop was nevertheless lawful since this BOLO qualifies as a "reasonable but mistaken judgment[]" that is not "plainly incompetent." *See Stanton v. Sims*, 571 U.S. 3, 6 (2013).

to the reason for the stop. *See Terry*, 392 U.S. at 20. The Court finds that Plaintiff has failed to adequately plead facts that support a violation of this second prong as well. As the camera footage shows, Officer Calvert only escalated his behavior in response to Plaintiff's and his wife's continued noncompliance. Faced with two resisting individuals who immediately exited their car, contrary to instructions, and did not follow orders, Officer Calvert's subsequent actions were reasonably related in scope to the reason for the stop.

Therefore, Plaintiff has not pleaded facts that demonstrate Officer Calvert violated his statutory or constitutional rights and cannot clear either prong of the qualified immunity analysis. Even without a finding of qualified immunity, the Court finds Plaintiff has not pleaded sufficient facts to establish an unconstitutional detention and would alternatively dismiss under Rule 12(b)(6).

2. Arrest without Probable Cause

Plaintiff also pleads that he was arrested without probable cause in violation of the Fourth Amendment.[11] Defendants maintain that their motion should be granted because Officer Calvert had probable cause to arrest Plaintiff for his alleged red light violation, because he believed Plaintiff was driving a stolen vehicle, and because Plaintiff resisted arrest. (Doc. No. 14 at 14). Defendants also argue that Officer Calvert's body camera footage shows that Plaintiff "used force to resist being placed in handcuffs," which further supplies the basis for probable cause. (Officer Calvert Body Camera Footage, Doc. No. 14-1 at 0:24-35).

---

[11] Plaintiff appears to attempt to characterize his claim that he was arrested without probable cause as a "false arrest" claim in his Response in opposition. (Doc. No. 25 at 10). There is no mention, however, of a false arrest cause of action in Plaintiff's Amended Complaint. (*See* Doc. No. 9). Plaintiff only pleads that he was arrested without probable cause in violation of the Fourth Amendment. (Doc. No. 9 at 7). Given that a motion to dismiss is evaluated based on the operative complaint, Plaintiff is not permitted to add claims to his Amended Complaint by way of his Response in opposition. Thus, the Court will not consider Plaintiff's attempted additional false arrest claim.

Probable cause for arrest exists when the totality of the facts and circumstances within the police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. *U.S. v. McCowan*, 469 F.3d 386, 390 (5th Cir. 2006) (citing *United States v. Ramirez*, 145 F.3d 345, 352 (5th Cir. 1998) and *United States v. Shugart*, 117 F.3d 838, 846 (5th Cir. 1997). "A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence at his direction from effecting an arrest [or] search ... by using force against the peace officer or another." Tex. Pen. Code. § 39.03(a). "It is no defense to prosecution under this section that the arrest or search was unlawful." *Id.* at § 38.03(b).

Moreover, in Texas, "the act of resisting can supply probable cause for the arrest itself." *Ramirez v. Martinez*, 716 F.3d 369, 376 (5th Cir. 2013). "The great weight of Texas authority indicates that pulling out of an officer's grasp is sufficient to constitute resisting arrest." *Id.* (citing cases); *see also id.* ("[U]nder Texas law Deputy Martinez could have reasonably concluded that Ramirez committed the offense when Ramirez pulled his arm away from Deputy Martinez's grasp"); *Vactor v. State*, 181 S.W.3d 461, 467 (Tex.App.—Texarkana, 2005, pet. denied) ("[O]nce Vactor forcefully resisted Webb's attempt to place him in handcuffs for the purpose of safely performing a *Terry* search, Vactor committed the new criminal offense of resisting a search.").

Based upon Plaintiff's Amended Complaint, it is somewhat unclear what crime he was ultimately charged with, but he pleads that Officer Calvert improperly stopped him for running a red light, which was later "prove[n] false" by a criminal court judge. (Doc. No. 9 at 4). He also pleads that Officer Calvert "provided patently false statements in an affidavit to charge Benfer with resisting arrest," and that "all charges were dropped" against him. (*Id.*). Plaintiff does not plead any additional facts to support a lack of probable cause.

16

The Court notes once again that Plaintiff's contention that a criminal court found, after the fact, that the evidence did not prove he ran a red light or resisted arrest, is not determinative of the inquiry of whether Officer Calvert had probable cause to stop or arrest him.[12] The relevant time period for the Court to consider is the officer's knowledge *at the moment of arrest*, not any events that take place later. As noted, Officer Calvert, believing *at the moment of arrest*, that Plaintiff had run a red light and was potentially driving a stolen vehicle, had reasonable suspicion for the stop. After the stop, Plaintiffs' own conduct provided probable cause. Plaintiff refused to follow Officer Calvert's instructions to stay in the car and immediately existed the vehicle. He started walking away and refused to stop, as ordered. He pulled his arm away multiple times when Officer Calvert tried to restrain him. Case law is clear that pulling out of an officer's grasp, as Plaintiff did here, constitutes resisting. *See Ramirez*, 716 F.3d at 376. Thus, at the moment of confrontation, Plaintiff's active resistance supplied probable cause for Officer Calvert to effectuate the arrest.

This Court therefore finds that Officer Calvert did not violate a statutory or constitutional right of Plaintiff's, and neither prong of the qualified immunity analysis is met on this claim. Accordingly, Plaintiff has not pleaded sufficient facts to make out a viable claim under the Fourth Amendment for arrest without probable cause.

3. Excessive Force

Plaintiff also makes a claim based upon the alleged use of excessive force. Specifically, Plaintiff pleads that after he was improperly stopped, Officer Calvert "unleashed Hero to bite and the rend [sic] the flesh of Benfer" and that he subsequently suffered severe injuries requiring stitches including one close to the brachial artery which can lead to death in minutes if severed."

---

[12] "Foundational to our qualified immunity doctrine is the concept that we must view an officer's actions from that officer's point of view without the benefit of hindsight. From the comfort of a courtroom or chambers, it is often possible for judges to muse on how an officer could have handled a situation better. But that does not mean the officer is not entitled to qualified immunity." *Solis v. Serrett*, 31 F.4th 975, 978 (5th Cir. 2022).

(Doc. No. 9 at 4). Plaintiff does not plead, perhaps purposefully, any additional facts pertaining to how the arrest and involvement of the K-9 with Officer Calvert took place.

In their Motion to Dismiss, Defendants argue that Plaintiff has failed to plead facts that would support an excessive force claim and that Officer Calvert is immune from these claims. (Doc. No. 14 at 16). Defendants contend that Plaintiff has failed to plead any injury associated with being grabbed by Officer Calvert when he attempted to handcuff Plaintiff and when he was pushed into the bushes.[13] (*Id.*). Moreover, Defendants maintain that Plaintiff fails to plead facts that support a claim for excessive force regarding the bites he sustained from Officer Calvert's K-9. (*Id.*).

To succeed in proving an excessive force claim, the Plaintiffs must "establish (1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 287 (5th Cir. 2020); *Hale v. City of Biloxi, Miss.*, 731 Fed. App'x 259, 262 (5th Cir. 2018). "[W]hether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* The "reasonableness" inquiry is an objective one, and focuses on whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them. *Id.*

---

[13] To the extent Plaintiff contends that he has an excessive force claim centering on being handcuffed or pushed into the bushes, the Court notes that he does not allege any facts to support this cause of action in his Amended Complaint. Moreover, there is no mention, discussion, or defense of an excessive force claim centered on these particular alleged injuries in his Response in opposition to Defendants' Motions to Dismiss. (*See* Doc. No. 25). Since the Amended Complaint is wholly devoid of facts concerning an excessive force claim centering on being handcuffed or pushed into the bushes and Plaintiff failed to address or defend this claim in his Response, this Court finds that he has abandoned those claims and they are hereby dismissed.

at 395, 397. The Court will analyze whether Plaintiff asserted sufficient allegations in his Amended Complaint to satisfy each element as to the dog bites Plaintiff experienced.

*Injury:* A plaintiff must show he or she was injured to succeed on an excessive force claim. Physical injuries are not necessarily required. *See Petta v. Rivera*, 143 F.3d 895, 899 (5th Cir. 1998). Rather, psychological pain, injuries, and disabilities as the result of the use of excessive force will suffice for the injury element. *Id.* In his Amended Complaint, Plaintiff pleads that he "suffered severe bite injuries some requiring stitches [sic] including one close to the brachial artery which can lead to death in minutes if severed." (Doc. No. 9 at 4). The Bogardus Report further notes that Plaintiff suffered bite injuries to his left and right biceps, the right of his back, and to his neck. (Doc. No. 9-1 at 6). Therefore, Plaintiff has adequately pled facts supporting the injury requirement.

*Causation:* The second element of an excessive force case requires a plaintiff to show his or her injuries were "directly and only" a result of the excessive force. It is here that Plaintiff's allegations fail. As discussed, Plaintiff refused to comply with orders to remain in his vehicle and walked away from Officer Calvert despite receiving warnings about the K-9. (Doc. No. 14-1 at 0:23-31). Plus, during the encounter with Plaintiff, Plaintiff's wife joined the tussle and appears to have reached for Officer Calvert's duty belt presumably near his service pistol. (*Id.* at 0:47). It was only then that Officer Calvert called for his K-9 to "assist," and the dog bit Plaintiff.

Considering these uncontroverted facts, the Court finds that Plaintiff's injuries are not directly and only the result of an instance of alleged excessive force. From the beginning of the encounter, Plaintiff disobeyed Officer Calvert's commands to stay in his vehicle and to stop walking. Plaintiff continued to resist Officer Calvert's commands to stop even after Officer Calvert

informed him that he had a dog that would bite him. Therefore, any injury caused by the dog bites was not directly and only the result of Officer Calvert's behavior.

Accordingly, the Court finds that Plaintiff's injuries, and their severity, were in large part due to his refusal to comply with Officer Calvert's directions. Had Plaintiff remained in his vehicle or stopped when Officer Calvert asked him to, the deployment of the K-9 and resulting injuries would never have occurred. Plaintiff had multiple opportunities, from the moment he exited his vehicle and began walking away, and even after Officer Calvert warned him that he had a dog that would bite him, where he could have cooperated. Thus, Plaintiff's allegations fail to satisfy the causation requirement.

*Reasonableness*: The third prong considers whether the force used was clearly unreasonable. Whether a force is reasonable is "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers," violates the Fourth Amendment. *Id*. Courts assess "reasonableness" using and objective standard and must account for the fact that police are "forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 397.

Even if the injuries were found to be caused by Officer Calvert, Defendants maintain, and this Court finds, that the force used by Officer Calvert was reasonable because Plaintiff resisted arrest and defied Officer Calvert from the moment he exited his vehicle to when he was finally handcuffed. (Doc. No. 14 at 16). Moreover, Defendants argue that Plaintiff's wife reaching in the area of Officer Calvert's duty belt near his service pistol added to the "immediate threat" that Officer Calvert was experiencing as he struggled to get Plaintiff to stop walking. Defendants

20

contend that Officer Calvert was ultimately "[f]aced with the split-second decision of being disarmed and attacked by Plaintiff [and his wife]—with no other officer to assist." (Doc. No. 14 at 17). According to Defendants, any objectively reasonable officer faced with the same facts and circumstances would have deployed their K-9 to assist and subdue Plaintiff until Officer Calvert could detain both Plaintiff and his wife. (*Id.*). Moreover, the entire incident involving the K-9 lasted approximately one minute and 48 seconds.[14] Officer Calvert only deployed the K-9 to subdue Plaintiff until he was able to retrieve his second pair of handcuffs from his vehicle. He restrained the K-9 once Plaintiff was successfully handcuffed. The incident did not last longer than necessary to detain Plaintiff and his wife.

Considering the totality of the circumstances, the Court finds, despite Plaintiff's conclusory contentions to the contrary, that Officer Calvert's use of force was not excessive and he did not violate Plaintiff's statutory or constitutional rights. From the outset of Officer Calvert's interaction with Plaintiff and his wife, they refused to comply with basic instructions. An objectively reasonable officer, when dealing with two individuals refusing to comply with simple commands, one of whom also attempted to potentially disarm him by grabbing at his duty belt, would have deployed his K-9 to assist. Therefore, Plaintiff has failed to plead facts showing Officer Calvert's use of force was clearly unreasonable.

Fifth Circuit precedent on excessive force further supports this conclusion. In a previous § 1983 case against the City of Baytown, the Fifth Circuit reversed this Court's finding that a question of excessive force existed where far more egregious facts were at play. In *Solis v. City of*

---

[14] The Court notes that the Bogardus Report states that the interaction between Officer Calvert's K-9 and Plaintiff lasted two minutes and fourteen seconds. (Doc. No. 9-1 at 6). Officer Calvert's body camera footage, however, shows Officer Calvert presumably deploying his K-9 at 0:49 when he yells "assist!" and then retrieving the K-9 after Plaintiff was successfully handcuffed at 2:35. (Doc. No. 14-1). This means the encounter involving the K-9 was approximately a minute and 48 seconds, not two minutes and 14 seconds as the Bogardus Report states. That differential could be due to timing issues as opposed to substantive differences.

*Baytown, Texas*, 2021 WL 1566445, at \*1 (S.D. Tex. Apr. 21, 2021), the plaintiff was riding in her car with her boyfriend when they were pulled over by City of Baytown police officers. After both being asked to exit the vehicle, the plaintiff's boyfriend asked whether the officer was conducting a field sobriety test on him, which the police officer confirmed. *Id.* When the plaintiff's boyfriend replied that he was not intoxicated, the officer asked him to turn around and place his hands behind his back and arrested him without incident. *Id.* During this exchange, the plaintiff filmed the encounter with her cellphone. She eventually stopped filming but kept her phone in her hand. *Id.*

The arresting officer then walked over to where the plaintiff was standing, and the plaintiff asked for the arresting officer's badge number. *Id.* Rather than providing it, the officer asked to see her phone and reached out in an apparent attempt to take her phone from her hand. *Id.* The plaintiff jerked her phone away from the officer's hand, took a step back, and refused, asking again for his badge number. *Id.* The officer then stated, "Well I don't want you to drop it when I arrest you, so could you please--." *Id.* The plaintiff responded while the officer was still speaking, "Drop it? Excuse me?" and took another step back. *Id.* Before the officer could finish his last sentence and while the plaintiff was saying "Excuse me?" the officer quickly approached plaintiff and grabbed her left arm, twisted it behind her back, and forced her onto the ground, where one of the officers placed his knee on her back while he handcuffed her. *Id.* The plaintiff was charged with public intoxication, but the charge was dismissed a few days later. *Id.*

Based on the body camera footage, this Court found that the plaintiff was not physically threatening the officers in any way and since neither officer gave any indication that turning over her cell phone was connected to her imminent arrest. *Id.* at 8. This Court also found that the plaintiff jerking her arm away and stepping away from the officer could reasonably be interpreted

as an effort to retain her cellphone, not an attempt to resist arrest. *Id.* The incident lasted only seconds. Finally, this Court found that the "quickness with which the officers resorted to tackling [plaintiff] to the ground militates against a finding of reasonableness." *Id.* at 9 (citing *Trammel*, 868 F.3d at 342).

The Fifth Circuit reversed this Court's findings and found immunity as a matter of law. It found that the plaintiff's resistance to arrest cut in favor of the officers, and that it was reasonable for the officers to perceive her as actively resisting arrest. It wrote:

> Case law distinguishes between active and passive resistance. "[W]here an individual's conduct amounts to mere 'passive resistance,' use of force is not justified." *Trammell*, 868 F.3d at 341. Here, Solis was generally hostile to the officers from the beginning of the traffic stop. She emphasized that she and Robinson were near their home, argued with the officers, repeatedly implied that Robinson was pulled over only because of his race, pulled away when Serrett asked for her phone, and stepped back and exclaimed "Drop it? Excuse me!" when Serrett told her she was being arrested. This court has also acknowledged that "a suspect who backs away from the arresting officers is actively resisting arrest—albeit mildly." *Buehler*, 27 F.4th at 984 (cleaned up). Solis also seemed to struggle against the officers as they grabbed her arms, which viewed from the officers' perspective could be "another form of resistance." *Id.* Accordingly, it may have been reasonable for the officers to perceive Solis as actively resisting arrest, and this factor weighs in the officers' favor.

*Solis v. Serrett*, 31 F.4th 975, 982-83 (5th Cir. 2022).

As an initial matter, the Fifth Circuit reversed this Court's findings even though the plaintiff's actions in *Solis* were clearly less akin to resisting arrest than Plaintiff's were in this case, except the Plaintiff's conduct here was much more egregious. There are also several parallels between the Fifth Circuit's findings in *Solis* and the case at hand. The court noted that "a suspect who backs away from the arresting officers is actively resisting arrest—albeit mildly." *Id.* (quoting *Buehler v. Dear*, 27 F.4th 969, 984 (5th Cir. 2022)). Here, Plaintiff was clearly actively resistant to Officer Calvert from the very beginning of the encounter. He refused to comply with basic

commands to stop even after Officer Calvert tried to physically stop Plaintiff and warned him that he would be bitten by a K-9. Setting aside Plaintiff's wife's involvement—which escalated the incident—Plaintiff initially refused to get on the ground when he was commanded to by Officer Calvert and resisted putting his hands behind his back even after the K-9 was deployed. Thus, the Court finds that it was reasonable for Officer Calvert to perceive that Plaintiff was actively resisting arrest.

Furthermore, the Fifth Circuit has directly spoken to whether the use of a K-9 constitutes excessive force in *Schumpert v. City of Tupelo*, 905 F.3d 310 (5th Cir. 2018) and *Escobar v. Montee*, 895 F.3d 387 (5th Cir. 2018). In *Schumpert*, the plaintiff fled from the police after he was pulled over for failing to use a turn signal and driving without a working tag light. *Schumpert*, 905 F.3d at 315. Once the officer located the plaintiff, who was hidden under a house in a crawl space, the officer gave plaintiff a verbal warning to come out or his K-9 would bite him. *Id.* The plaintiff disregarded the warning and burrowed further under the house, which prompted the officer to release his K-9. *Id.* The plaintiff fought the dog and then the officer before being shot. *Id.* The Fifth Circuit held that the officer's use of the K-9 was reasonable, noting that it has "repeatedly held that the 'measured and ascending' use of force is not excessive when a suspect is resisting arrest—provided the officer ceases the use of force once the suspect is subdued." *Id.* at 323.

In *Escobar*, the plaintiff fled from the police with a knife after assaulting his wife. 895 F.3d 387 (5th Cir. 2018). The police eventually found the plaintiff in a yard and released a K-9 to "capture and hold him." *Id.* The plaintiff was bitten by the dog until fully handcuffed by the police, even though the plaintiff swore that he dropped the knife. *Id.* The Fifth Circuit held that the officer had not used excessive force by permitting the police dog to continue biting the plaintiff until plaintiff was "fully subdued and in handcuffs," which lasted approximately one minute. *Id.* at 391.

The Court finds both cases instructive. Plaintiff, like the plaintiff in *Schumpert*, was warned that if he did not comply, a K-9 would be deployed and that the dog could bite him. When the plaintiff refused to comply by burrowing further into the house, the officer released the K-9. Here, Plaintiff continued to refuse to comply with Officer Calvert's commands to stop even after Officer Calvert escalated his warnings to stop and informed Plaintiff that he had a dog that could bite him. Therefore, this Court follows *Schumpert* and finds that Officer Calvert used "measured and ascending" force when Plaintiff resisted arrest. Moreover, Officer Calvert ceased the use of force once Plaintiff was successfully handcuffed. Thus, Officer Calvert's use of force was reasonable.

*Escobar* is similarly instructive. Although the Court here assumes Plaintiff was not armed as was the plaintiff in *Escobar*, Plaintiff's wife certainly escalated the conflict by reaching near Officer Calvert's duty belt, which in turn further necessitated the deployment of the K-9. Further, the plaintiff in *Escobar* and Plaintiff were both bitten by the K-9 until each was handcuffed by the police. The Fifth Circuit found that the K-9 continuing to bite the plaintiff was reasonable, given the duration of the encounter. Plaintiff's encounter with the K-9 also lasted approximately one minute, albeit a bit longer. Accordingly, this Court finds that Officer Calvert allowing the K-9 to continue to bite Plaintiff until he was fully handcuffed was not a use of excessive force.

Given that existing case law counsels against a finding of excessive force in this case, the Court finds Plaintiff's arguments fall short of a finding of excessive force. Therefore, Plaintiff has failed to sufficiently plead that Officer Calvert violated a constitutional right as is required to overcome the first prong of qualified immunity. Having already found the second prong similarly unsatisfied,[15] Officer Calvert is entitled to immunity on Plaintiff's claim of excessive force, and it is hereby dismissed.

---

[15] Plaintiff seems to have argued that, even without a body of relevant case law, the *Graham* excessive-force factors can deem the right clearly established "in an obvious case." (Doc. No. 25 at 9) (citing *Newman v. Guedry,* 703 F.3d

4. Malicious Prosecution

Plaintiff alleges that Officer Calvert "made material misrepresentations" in his police report to "justify the arrest and prosecution when he knew there was no probable cause to either arrest or prosecute Plaintiff." (Doc. No. 9 at 9). In their Motion to Dismiss, Defendants argue that Plaintiff has failed to plead plausible facts that state a claim for malicious prosecution.[16] (Doc. No. 14 at 15). According to Defendants, Officer Calvert's body camera footage shows that Plaintiff resisted arrest and the pleadings in his Amended Complaint "shows probable cause to believe Plaintiff committed an offense for which he could be arrested." (Id.). Since Plaintiff has pleaded no factual allegations to indicate that Plaintiff was arrested without probable cause or that Officer Calvert's motives were malicious, Defendants maintain that Plaintiff has failed to state a claim upon which relief may be granted. (Id.). This Court agrees.

To prevail on a malicious prosecution claim under § 1983, the plaintiff must show that (1) a criminal action was commenced against him, (2) the prosecution was caused or aided by the defendant, (3) the action terminated in the plaintiff's favor, (4) the plaintiff was innocent, (5) the defendant acted without probable cause, (6) the defendant acted with malice, and (7) the criminal

---

757, 764 (5th Cir. 2012)). After examining the *Graham* factors and Fifth Circuit precedent, this Court does not find this case to be such an "obvious case" as to be clearly established absent case law.

[16] Defendants also separately argue that Plaintiff fails to state a *Franks* claim in his Amended Complaint. A *Franks* claim refers to *Franks v. Delaware*, 438 U.S. 154 (1978) in which an officer knowingly, intentionally, or with reckless disregard for the truth makes a false statement in a warrant affidavit. Plaintiff does not explicitly mention the *Franks* case or categorize this allegation as being a *Franks* claim. In fact, Plaintiff's allegation of Officer Calvert's "material misrepresentations" is categorized under his malicious prosecution cause of action. Nevertheless, in their Motion to Dismiss, Defendants maintain that to the extent that Plaintiff is attempting to bring a *Franks* claim, Officer Calvert conducted a warrantless arrest of Plaintiff, which refutes any cognizable *Franks* claim. (Doc. No. 14 at 17). Since Plaintiff's arrest did not involve a false statement in a warrant affidavit and was a warrantless arrest, Defendants contend that Plaintiff fails to state a claim under *Franks*. (Id.). To the extent Plaintiff has pleaded a *Franks* claim, he does not allege any facts to support this cause of action in his Amended Complaint. Moreover, there is no mention, discussion, or defense of this claim in his Response in opposition to Defendants' Motions to Dismiss. (*See* Doc. No. 25). Since the Amended Complaint is wholly devoid of facts concerning a *Franks* claim and Plaintiff failed to address or defend this claim in his Response, this Court finds that, to the extent Plaintiff pleaded a *Franks* claim to begin with, he has abandoned it and it is hereby dismissed.

proceeding damaged the plaintiff. *See Goodson v. City of Corpus Christi*, 202 F.3d 730, 740-41 (5th Cir. 2000); Existence of probable cause is an absolute bar to maintaining an action for malicious prosecution under the Fourth Amendment.

In Plaintiff's Amended Complaint, he pleaded that he was charged with resisting arrest by Officer Calvert, which satisfies the first and second elements. (Doc. No. 9 at 4). Plaintiff also pleads that "all charges were dropped" against him "after much money and time w[as] expended," which satisfies the third and fourth elements. (*Id.*). Plaintiff further pleads that Officer Calvert "provided patently false statements in an affidavit to charge Benfer with resisting arrest" and that he "made material misrepresentations in the police report in order to justify the arrest and prosecution when he knew there was no probable cause to arrest or prosecute Plaintiff." (*Id.* at 4, 9). Viewing Plaintiff's Amended Complaint in the light most favorable to him, the Court finds that, taken as true, these allegations satisfy the sixth element. Finally, in addition to "much money and time" expended, Plaintiff pleaded physical injury as a result of his encounter with Officer Calvert. Thus, the Court finds that Plaintiff has satisfied the seventh element.

The Court does not find, however, that Plaintiff has satisfied the fifth element, that Officer Calvert acted without probable cause. As noted above, the Court concluded that Officer Calvert had probable cause to arrest Plaintiff and that undermines Plaintiff's right to proceed here. Officer Calvert had probable cause based on Plaintiff's conduct resisting arrest and Officer Calvert's then-existing belief that Plaintiff ran a red light and was driving a stolen vehicle.

Accordingly, given that Plaintiff has failed to plead facts sufficient to satisfy each element of a claim for malicious prosecution that would also give rise to a constitutional violation, he cannot overcome either prong of qualified immunity on this this cause of action.

## C. State Law Assault Claim Against Officer Calvert

In addition to his various § 1983 claims, Plaintiff brings a state law tort claim for assault against Officer Calvert, though it is unclear whether Plaintiff is suing Officer Calvert in his official or individual capacity. Defendants argue both that Plaintiff has failed to plead facts sufficient to support this claim and that Officer Calvert is statutorily immune against Plaintiff's assault claim under Texas law. (Doc. No. 14 at 17). Specifically, they argue that the Texas Tort Claims Act ("TTCA") requires Plaintiff to have brought the claim against the City of Baytown because Officer Calvert is individually immune under the statute. (*Id.*). The Court agrees and finds this claim barred by the TTCA.

A public employee may be individually liable for his tortious conduct outside the general scope of employment. *Univ. of Texas Health Sci. Ctr. at Houston v. Rios*, 542 S.W.3d 530, 531 (Tex. 2017). The TTCA defines "scope of employment" as "the performance for a governmental unit of the duties of an employee's office or employment and includes being in and about the performance of a task lawfully assigned to an employee by competent authority." Tex. Civ. Prac. & Rem. Code § 101.001(5). An official acts within the scope of her authority if she is discharging the duties generally assigned to her. *Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1997) (holding that that on-duty police officers, pursuing a suspect in their squad car, did not act outside the scope of their authority even though they drove without regard for the safety of others).

If the alleged tortious conduct was within the general scope of employment, Section 101.106 of the TTCA governs. This section "require[es] a plaintiff to make an **irrevocable election** at the time suit is filed between suing the governmental unit under the Tort Claims Act or proceeding against the employee alone." *Mission Consol. Sch. Dist. v. Garcia*, 253 S.W.3d 653,

28

657 (Tex. 2008) (emphasis added). If the plaintiff chooses to sue the employee alone, the TTCA

states, in relevant part:

> "If a suit is filed against an employee of a governmental unit based on
> conduct within the general scope of that employee's employment and if it
> could have been brought under this chapter against the governmental unit,
> the suit is considered to be against the employee in the employee's official
> capacity only. On the employee's motion, the suit against the employee
> shall be dismissed unless the plaintiff files amended pleadings dismissing
> the employee and naming the governmental unit as defendant on or before
> the 30th day after the date the motion is filed."

Tex. Civ. Prac. & Rem. Code § 101.106(f).

Here, Officer Calvert was acting within his general scope of employment as police officer

for the City of Baytown. The alleged misconduct occurred while Officer Calvert was performing

tasks lawfully assigned to him. Like the officers in *Lancaster*, he was on duty and actively pursuing

Plaintiff for suspected traffic violations. When Plaintiff chose to bring assault claims against

Officer Calvert based on conduct within the scope of his employment, the irrevocable election of

Section 101.106 was triggered. As a consequence, the Court will proceed with the understanding

that Plaintiff sued Officer Calvert in his official capacity.

Section 101.106(f) therefore dictates that the suit against the employee "shall be dismissed"

unless the plaintiff amends his pleadings to name the governmental unit within 30 days after the

motion was filed. Officer Calvert and the City of Baytown filed this motion to dismiss on

September 28, 2022 (*See* Doc. No. 14). Plaintiff has failed to amend (or at least move to amend)

his pleadings as required under the statute on or before the 30th date that this motion was filed. In

fact, Plaintiff has already amended his complaint once and did not attempt to cure this problem.

As Plaintiff's claim is against Officer Calvert in his official capacity, it must be dismissed

because the City of Baytown has not waived its sovereign immunity for intentional torts for assault

and battery. *See, e.g.*, *Huff v. Refugio County Sheriff's Dept.*, 2013 WL 5574901, at \*3 (S.D. Tex. Oct. 9, 2013).

Accordingly, Plaintiff's assault claim against Officer Calvert is dismissed.

**D. Section 1983 Claims Against the City of Baytown**

Plaintiff also sues the City of Baytown under § 1983. Plaintiff alleges that the City of Baytown "did not have adequate written policies, nor did they train or supervise Calvert in the proper handling of a police dog." (Doc. No. 9 at 8). Plaintiff further pleads that the City of Baytown "condoned and ratified the actions of Calvert by failing to discipline or retrain him" and that it has a "pattern, practice and custom of using a biting police dog to inflict injuries upon suspects even if they do not pose a threat" and to "punish them for not complying or for fleeing after they have complied." (*Id.*).

To support his contentions, Plaintiff includes five examples in his Amended Complaint of instances where a City of Baytown K-9 injured people during a stop or arrest. (*See* Doc. No. 14). The five instances are summarized below in bullet points to better facilitate the analysis:

- In 2019, Raphael White was fleeing from the City of Baytown police on foot when Officer Calvert deployed his K-9 to bite White. (*Id.* at 3). According to Plaintiff's Amended Complaint, White sued, and Officer Calvert's motion for summary judgment was denied because a Southern District of Texas judge found that there was a fact issue pertaining to excessive force (*Id.* at 2-3);
- In October 2021, Alejos Lopez "was not brandishing a weapon" but he was "repeatedly bitten by a Baytown police dog controlled by a Baytown police officer" (*Id.* at 4);
- On January 4, 2020, Trevor Scott was being pursued by the City of Baytown police in a motor vehicle chase when he was "repeatedly bitten by a Baytown police dog controlled by a Baytown police officer" (*Id.* at 5);
- In May 2020, Mark Burns was "repeatedly bitten by a Baytown police dog controlled by a Baytown police officer" (*Id.*); and,

30

- On March 29, 2022, Joseph Lane "was not brandishing a weapon at the time" and was "repeatedly bitten by a Baytown police dog controlled by a Baytown police officer." (*Id.*).

In their Motion to Dismiss, Defendants argue that Plaintiff has failed to identify a specific unconstitutional policy, custom, or practice for which a policymaker could be held liable, or that a policymaker was aware of an unconstitutional policy and deliberately chose to maintain it. (Doc. No. 14 at 23, 24). Defendants also argue that Plaintiff has failed to plead any facts to suggest that a policymaker's conduct was a moving force that caused Plaintiff to experience a constitutional deprivation or that it ratified unconstitutional conduct. (*Id.* at 24).

The Court notes that the City of Baytown, as a municipality, may not be held liable under § 1983 on a theory of vicarious liability. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Kitchen v. Dall. Cty.*, 759 F.3d 468, 476 (5th Cir. 2014). Municipalities may only be liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.

For municipal liability to attach, claims filed under § 1983 require a plaintiff to show three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose moving force is the policy or custom. *See Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). A plaintiff must still "provide fair notice to the defendant, and this requires more than generically restating the elements of municipal liability." *Id.* Such allegations may include "past incidents of misconduct to others, multiple harms that occurred to the plaintiff, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy

31

or training inadequacy." *Id*; *see Custer v. Houston Police Dept.*, 2017 WL 5484114 (S.D. Tex. Nov. 15, 2017).

At the motion to dismiss stage, plaintiffs need not identify a particular policymaker by name to establish municipal liability but must plead facts that show that the defendant or defendants acted pursuant to a specific official policy, which was promulgated or ratified by the legally authorized policymaker. *Groden v. City of Dallas, Tex.*, 826 F.3d 280, 282 (5th Cir. 2016).

For an official policy, the pleadings for a § 1983 claim are adequate against a city when they set forth "specific factual allegations that allow a court to reasonably infer that a policy or practice exists and that the alleged policy or practice was the moving force" for the constitutional violation asserted. *Balle v. Nueces Cty. Tex.*, 690 F.App'x 847, 852 (5th Cir. 2017) (quoting *Spiller v. City of Tex. City Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)). Finally, a Plaintiff must "sufficiently plead any causal connection between the alleged unconstitutional policy or custom and the harm alleged to have occurred." *Joiner v. Murphy*, 2016 WL 8792315 at *4 (S.D. Tex. Aug. 12, 2016) (quoting *Doe 1—Doe 10 v. City of Wichita Falls, Tex.*, No. 7-06CV-106-R, 2007 WL 959028 at *2 (N.D. Tex. Mar. 30, 2007)).

Plaintiff has not identified any specific policymaker in the City of Baytown. Instead all of his claims against the City are alleged without any degree of specificity. Moreover, Plaintiff fails to identify any official City of Baytown policy in his Amended Complaint. (*See* Doc. No. 14). Thus, to the extent that he pleads that municipal liability should attach on the basis of an official policy, the Court grants Defendants' Motion to Dismiss.

In the absence of an official policy, plaintiffs may also survive a Rule 12(b)(6) motion if they plead facts to infer that there existed "[a] persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so

32

common and well settled as to constitute a custom that fairly represents municipal policy." *Hick-Fields v. Harris County, Tex.*, 860 F.3d 803, 808-09 (5th Cir. 2017).

The Fifth Circuit has previously found that establishing a pattern requires similarity, specificity, and sufficiently numerous prior incidents. *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017). The Court finds that Plaintiff has failed to adequately plead these three requirements and thus has failed to plead facts establishing a pattern for municipal liability to attach to the City of Baytown.

First, Plaintiff has not pleaded sufficiently numerous prior incidents. When examining the numerosity requirement, courts place the alleged constitutional violations in the context of the size of the police department and the corresponding time period. *see Davidson*, 848 F.3d at 96-97 (5th Cir. 2017) (three arrests over three and a half years did not establish a pattern of constitutional violations for the Stafford P.D.); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851-52 (5th Cir. 2009) (holding 27 complaints of excessive force over a period of three years in a department with more than 1,500 officers did not constitute a pattern); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (holding eleven incidents cannot support a pattern of illegality in Houston); *Moreno v. City of Dallas*, 2015 WL 3890467, at \*9 (N.D. Tex. June 18, 2015) (granting motion to dismiss because "facts suggesting an average of less than two incidents of excessive force per year over the course of five years are not sufficient to indicate a pattern of abuses").

Here, although Plaintiff pleads five instances of where individuals have allegedly been bitten by K-9 spanning four years, this Court does not find that these instances give rise to "[a] persistent, widespread practice . . . so common and well settled as to constitute a custom that fairly represents municipal policy." *Hick-Fields*, 860 F.3d at 808-09. As an initial matter, Plaintiff provides no evidence concerning any of the previous incidents, or that the other incidents, aside

33

from White's, resulted in litigation alleging a constitutional violation. Seemingly, the only similarity is that a K-9 was deployed. Moreover, even taking Plaintiff's case into account, he can point to six total incidents relating to a K-9 and the City of Baytown from 2018 to date. Based on existing case law, this is insufficient to satisfy the numerosity requirement.

Significantly, Plaintiff has failed to plead the other two requirements for pattern liability—specificity and similarity. Demonstrating a pattern requires similarity and specificity—prior indications cannot simply be for "any and all "bad" or unwise acts, but rather must point to the specific violation in question." *Peterson*, 588 F.3d at 851 (quoting *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)).

Here, Plaintiff has failed to plead facts of the alleged violations with the required similarity. The Fifth Circuit requires prior instances to be sufficiently similar to the event that transpired in the current case. *Hicks-Fields*, 860 F.3d at 810. The facts that Plaintiff includes pertaining to each incident are scant at best. He pleads that five individuals were allegedly bitten by a City of Baytown K-9 (even when some of them were not brandishing a weapon). These are only broad and vague similarities, at best, to Plaintiff's case.

Plaintiff's allegations as they pertain to these other incidents are wholly lacking in the requisite specificity as well. Importantly, there is no description as to the conduct of the alleged victims. The Court is left wondering, for instance, if the other alleged victims in those other cases were also failing to follow an officer's instructions or if their companions also reached into the area where the officer kept his weapon. In other words, Plaintiff's descriptions of the prior incidents only tell the Court that the individuals were bitten, that no officer was injured, and that some of the individuals were not brandishing a weapon. These descriptions result in more questions than they answer. The Court cannot assume that these prior incidents amounted to

34

misconduct, much less constitutional violations, based upon these bare facts. Thus, Plaintiff's pattern theory of liability fails as he cannot show the prior incidents of alleged misconduct were sufficiently numerous, specific, or similar to his own.

Alternatively, Plaintiff seeks to impose municipal liability against the City based on a ratification theory, arguing that the City's failure to discipline Officer Calvert after this incident ratified his actions. (Doc. No. 25 at 21). The Supreme Court has provided that "if authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 L.Ed.2d 107 (1988). Nevertheless, the Fifth Circuit has repeatedly noted that the ratification theory has been limited to "extreme factual situations." *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir.2009); *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009). The subordinate's actions must be "sufficiently extreme—for instance, an obvious violation of clearly established law" for ratification to establish an official policy or custom for purposes of municipal liability. *Id.* Here, Plaintiff has neither pleaded facts nor cited to legal authority supporting his assertion that Officer Calvert's conduct rises to the level of an "obvious violation of clearly established law."

Finally, this Court finds that Plaintiff has failed to "sufficiently plead any causal connection between the alleged unconstitutional policy or custom and the harm alleged to have occurred." *Joiner*, 2016 WL 8792315 at *4 (quoting *Doe 1—Doe 10*, 2007 WL 959028 at *2 (N.D. Tex. Mar. 30, 2007)). As noted previously, Plaintiff only pleads that the City of Baytown: (1) "did not have adequate written policies, nor did they train or supervise Calvert in the proper handling of a police dog," (2) "condoned and ratified the actions of Calvert by failing to discipline or retrain him," and that (3) has a "pattern, practice and custom of using a biting police dog to inflict injuries upon

suspects even if they do not pose a threat" and to "punish them for not complying or for fleeing after they have complied." (*Id.*). These are conclusory statements that fail to allege a specific unconstitutional policy or custom that was the moving force in causing Plaintiff's injuries.

Accordingly, Plaintiff has failed to plead sufficient facts identifying a policymaker or an official policy that would give rise to municipal liability. Plaintiff has also failed to identify an unofficial custom or policy with sufficient similarity and specificity that could give rise to a pattern of excessive force and has fallen short of identifying deliberate conduct that the City of Baytown engaged in that made them the moving force behind Plaintiff's injuries. Thus, Plaintiff's claims against the City of Baytown are hereby also dismissed.

## IV.   Conclusion

For the foregoing reasons, the Court hereby **GRANTS** Defendants' Motion to Dismiss (Doc. No. 14).

Signed at Houston, Texas, this 4th day of October, 2023.

Andrew S. Hanen
United States District Judge